**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:08-CR-00038-TBR**

UNITED STATES OF AMERICA                                      PLAINTIFF

v.

BILLI JO SMALLWOOD                                           DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Defendant's motion for judgment of acquittal. Def.'s Mot., Docket Number ("DN") 226. The Government has responded. Gov't Resp., DN 234. The Defendant has not replied and the time to do so has now expired. Having considered the matter and being sufficiently advised, the Defendant's motion is DENIED.

**I.**

On September 22, 2010, Defendant Billi Jo Smallwood (hereinafter "Defendant" or "Billi Jo") was charged with a single count of violating 18 U.S.C. § 844(i). Superseding Indictment, DN 108, p. 1. Section 844(i) criminalizes the malicious destruction or the attempted destruction of any building in or affecting interstate commerce by means of fire. The statutorily prescribed penalties associated with a violation of § 844(i) vary if another person is injured or dies as a direct or proximate result of the fire. *See* 18 U.S.C. § 844(i). The superseding indictment charged that, as a direct and proximate result of the fire, the Defendant caused the death of two of her minor children. Superseding Indictment, DN 108, p. 1. On June 28, 2012, after a ten-day jury trial, the Defendant was convicted of violating § 844(i). Jury Verdict, DN 194. She currently awaits sentencing.

At the close of the Government's proof and again at the close of all proof, but before submission of the case to the jury, the Defendant moved for judgment of acquittal pursuant to

1

Federal Rule of Criminal Procedure 29(a). Trial Tr., DN 209, p. 56:4-5; Trial Tr., DN 211, p. 29:10-11. Taking the evidence in the light most favorable to the Government, the Court denied both motions. Trial Tr., DN 209, p. 56:14-17; Trial Tr., DN 211, pp. 29:25-30:1. On August 31, 2012, the Defendant moved for an extension of time to renew her motion for judgment of acquittal. Def.'s Mot., DN 220. That motion was granted, see Order of Sept. 9, 2012, DN 222, and the Defendant filed her renewed motion pursuant to Rule 29(c) on October 3, 2012, see Def.'s Mot., DN 226.

The Defendant now asks this Court to set aside the jury's verdict and enter a judgment of acquittal. Although the Defendant agrees that the Government proved that the residence at 4137D Dixie Road on the Fort Campbell Army Base was maliciously burned, she argues that the evidence presented at trial was insufficient for a reasonable jury to find beyond a reasonable doubt that she was the perpetrator of that crime. Def.'s Mot., DN 226, p. 2. In response, the Government points to specific evidence presented at trial that it believes was sufficient for any reasonable jury to find the Defendant guilty beyond a reasonable doubt.

## II.

After the close of all the evidence, and upon a motion by the defendant, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant may move for a judgment of acquittal, or renew such motion, within 14 days after a guilty verdict" or within such time as the court allows. Fed. R. Crim. P. 29(c)(1). It must be noted that "a defendant challenging the sufficiency of the evidence has a 'very heavy burden.'" *United States v. Gardner*, 488 F.3d 700, 709 (6th Cir. 2007) (quoting *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002)).

When considering a motion for judgment of acquittal, a court should not "'ask itself

whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *United States v. Blakeny*, 942 F.2d 1001, 1010 (6th Cir. 1991).

In determining whether sufficient evidence existed to sustain a conviction of the crime charged, the court does "'not weigh the evidence, assess the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001) (quoting *United States v. Wright*, 16, F.3d 1429, 1440 (6th Cir. 1994)). Instead, after a defendant has been convicted, "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319. In reviewing whether there was sufficient evidence to sustain a conviction, a court "must draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Salgado*, 250 F.3d at 446 (citing *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998)). "A judgment is reversed on insufficiency-of-the-evidence grounds 'only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole.'" *Gardner*, 488 F.3d at 710 (quoting *United States v. Barnett*, 398 F.3d, 516, 522 (6th Cir. 2005)).

When considering a Rule 29 motion, a court may sustain a conviction "through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *Salgado*, 250 F.3d at 446 (citing *United States v. Jackson*, 44 F.3d 1219, 1225 (6th Cir. 1995)).

**III.**

The Defendant argues that the Court must enter a judgment of acquittal because the evidence presented at trial was insufficient for any reasonable jury to find her guilty beyond a reasonable doubt of violating 18 U.S.C. § 844(i).  In support of her argument, the Defendant claims that there was "no confession, no incriminating statement, no witness identification, no fingerprints (other than those found on her own car), no motive, no reason[,] and no other indication or evidence of any kind which would lead any reasonable jury to believe that [she] was the perpetrator of this crime."  Def.'s Mot., DN 226, p. 4.  As pointed out by the Government in a lengthy recitation of the evidence, the Defendant's arguments lack merit because significant circumstantial evidence exists upon which a reasonable jury could convict the Defendant.

After reviewing the trial proceedings, the Court has identified at least four categories of evidence which, when taken together, were sufficient for a reasonable jury to find the Defendant guilty beyond a reasonable doubt.[1]  First, evidence exists that the Defendant purchased a Blitz-brand gas can the afternoon before the fire and the same type of gas can was found at the scene of the crime and arguably used in the commission of the crime.  Second, phone records for the Smallwood residence show that it is extremely unlikely that the Defendant, as she maintained at trial, received a threatening phone call at 7:42pm on the evening of the fire.  Third, the location of the Defendant's burns and testimony explaining the significance of her statements that she saw a "blue flame" were sufficient for a reasonable jury to conclude that she was present at the source of the fire's ignition and not on the stairs of the residence as she claimed.  Finally, after hearing evidence about the family's economic condition and the Defendant's tumultuous

---

[1] These four categories are not the only evidence that supports the jury's verdict.  Other equally sufficient evidence may well exist.

relationship with her husband, a reasonable jury could conclude that the Defendant had a motive and reason to commit the crime charged. Although any one of these categories of circumstantial evidence standing alone might have been insufficient grounds for conviction, their combination creates significant evidence of guilt. Taking all of the evidence together and in a light most favorable to the prosecution, the Court holds that sufficient evidence was presented that would allow a reasonable jury to find beyond a reasonable doubt that the Defendant maliciously burned her residence in violation of 18 U.S.C. § 844(i), and that her actions directly or proximately caused the death of two of her minor children.

### A.

At trial the jury was presented with evidence concerning a Blitz-brand gas can the Defendant purchased the afternoon before the fire. This evidence was significant because the gas can nozzle recovered from the scene of the fire matched the type of nozzle used on the gas can purchased by the Defendant.

The fire at the Defendant's residence occurred in the early morning hours of Tuesday, May 29, 2007. *See, e.g.*, Test. Shannon Manns, DN 203, p. 71:15-23. The weekend prior to the fire, the Defendant, her husband, Wayne, and their minor children traveled to Georgia for a family reunion. Test. Matt Cummings, DN 205, p. 70:3-16. They returned to Fort Campbell on Monday, May 28, 2007, Memorial Day. Upon returning, the Defendant went shopping for supplies. In an interview conducted on May 31, 2007, the Defendant told investigators that she bought diapers, baby wipes, and other child care products from Wal-Mart. *Id.* at p. 70:17-22. Investigators conducted a subsequent interview with the Defendant on June 14, 2007, for the purposes of determining what items she had purchased upon returning from Georgia and the store from which she had purchased them. Test. Kurt Thielhorn, DN 205, pp. 108:2-4, 112:2-12.

By identifying the store and the items purchased, investigators hoped to use the store's surveillance video to determine whether she was being followed prior to the fire.[2]  *Id.* at p. 114:14-19.

Relying on the Defendant's version of events, investigators visited Wal-Mart stores in and around Fort Campbell but were unable to locate her on any of the surveillance videos.  *Id.* at p. 112:14.  This prompted investigators to interview the Defendant again on the morning of June 26, 2007, to see if she could provide more detail about the items she purchased.  *Id.* at pp. 111:5-23, 112:18-22, 114:9-11.  It was during this interview that, for the first time, the Defendant told investigators she shopped at the Wal-Mart in Hopkinsville, Kentucky and not at the stores closer to Fort Campbell.[3]  *Id.* at p. 115:16-18.  It was also during this interview, that the Defendant, for the first time, told investigators that she purchased a gas can during this shopping trip.  *Id.* at p. 117:2-7.

After this interview, investigators traveled to Hopkinsville and reviewed surveillance footage at that Wal-Mart.  *Id.* at pp. 118:15-119:18.  Again, however, they were unable to locate the Defendant on any of the security cameras.  *Id.* at p. 119:18.  Additionally, they could not find a gas can sold at Wal-Mart with a nozzle matching the one recovered from the scene of the fire.  *Id.* at pp. 118:21-25, 119:8-10.  They then contacted the Defendant by phone to inform her that their investigation was fruitless.  *Id.* at p. 119:22-23.  It was during this call that the Defendant said she stayed on the Army base when she returned from Georgia, did not go to Wal-Mart at all, and was simply unsure about the day she went shopping.  *Id.* at pp. 119:23-120:11.  She did,

---

[2] Investigators explained that Wal-Mart possesses the ability to match merchandise barcodes and surveillance video with the time the barcodes are scanned at checkout.  *See* Test. Kurt Thielhorn, DN 205, pp. 112:14-113:2. Therefore, by knowing the store visited, the items purchased, and the date of the purchases, investigators can locate an individual at the time of the purchase on surveillance video.

[3] Two Wal-Mart stores are located within in close proximity of Fort Campbell.  Test. Kurt Thielhorn, DN 205, p. 116:14.  By comparison, the Wal-Mart in Hopkinsville is at least a twenty minute drive from the Defendant's residence.  *Id.* at p. 116:20-22.

however, inform the investigators that after purchasing the gas can she filled it at a gas station between Hopkinsville and Fort Campbell. *Id.* at p. 120:13-17. Prompted by this information, investigators stopped at every gas station between Hopkinsville and Fort Campbell during their return trip and searched for gas cans with nozzles matching the one recovered from the fire. *Id.* at p. 121:1-15. They found and purchased one they believed to be an exact match. *Id.* at p. 121:13-15. The investigators showed the gas can to the Defendant upon returning to Fort Campbell, and she confirmed that it was similar to the one she had purchased. *Id.* at p. 123:6-11. During this conversation it was revealed that the Smallwoods already owned two gas cans, which were stored in a shed behind their residence. *Id.* at p. 123:13-22. When asked why she bought a gas can if the family already owned two others, the Defendant replied that she needed to mow the grass at their residence in order to avoid being fined by the Army base. *Id.* at pp. 123:25-124:4.

Investigators later learned that the Defendant purchased the Blitz-brand gas can and child care products from a K-Mart in Hopkinsville on May 28, 2007, and not a Wal-Mart as she stated on several prior occasions.[4] *Id.* at 135:8-9. The purchases are known to have been made at the K-Mart because the Defendant paid by check. *Id.* In the regular course of business, stores, like K-Mart, retain a record of all checks and any items purchased with those checks. Therefore, it is possible to know what was purchased with a check so long as the particular check can be identified.

The Defendant's subpoenaed financial records reveal that she wrote check number 1019

---

[4] During the period of time relevant to this case, K-Mart had an exclusive arrangement with Blitz USA, the manufacturer of the gas can at issue, to sale only Blitz-brand gas cans in their stores. Test. Todd McClain, DN 206, p. 29:5-9. Blitz's corporate representative testified that the nozzle recovered from the scene of the fire was the type of nozzle used on Blitz gas cans sold at K-Mart stores in May of 2007. *Id.* at p. 31:14-16. Thus, the nozzle recovered from the scene of the fire matched the nozzle of the gas can purchased by the Defendant at K-Mart on May 28, 2007.

in the amount of $29.43 to K-Mart in Hopkinsville on May 28, 2007, at 1:48pm. Test. Anita Reno, DN 208, pp. 47:12-16, 53:8-10. Check number 1019, which bore the Defendant's signature, showed that she purchased a calling card, diapers, baby wipes, and a two-gallon gas can. *Id.* at pp. 52:21-22; 56:25-18. Further investigation revealed that the Defendant's checking account contained less than $29.43 at the time she wrote check number 1019, and that she incurred $58 in overdraft fees as a result of insufficient funds. *Id.* at pp. 51:23-52:18. For the period of financial records subpoenaed by the Government – February 2007 through June 2007 – the Defendant only purchased goods by check or debit card once at the K-Mart in Hopkinsville. *Id.* at p. 60:1-9. That day was May 28, 2007, the day she bought the Blitz gas can. *Id.*

Reviewing in the light most favorable to the prosecution, the evidence showed that the Defendant purchased a two-gallon Blitz gas can from the K-Mart in Hopkinsville approximately twelve hours before the fire at her residence. On multiple occasions she gave a detailed accounting of the baby supplies she purchased when she returned from Georgia but did not inform investigators about the gas can until her third or fourth interview. She also told investigators she shopped at Wal-Mart when in fact she bought the gas can at a K-Mart located at least twenty minutes from her residence even though other stores were closer. This was the only time she made purchases by check or debit card at that particular store between February and June of 2007. She purchased the gas can at a time when she already owned two others and lacked sufficient funds to cover the purchase of a third. Finally, the nozzle of the gas can recovered from the fire matched the type of nozzle used on the Blitz gas can purchased by the Defendant. Considered in conjunction with the other evidence discussed below, this evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that the Defendant maliciously burned her residence in violation of 18 U.S.C. § 844(i).

**B.**

After the fire the Defendant told investigators that at approximately 7:42pm on May 28, 2008, she received a phone call from an unknown person who threatened the life of her husband. Test. Matt Cummings, DN 205, pp. 71:3-5, 72:2-14. Despite her statements, the jury heard evidence that there is no record of an incoming call to the Smallwood residence at 7:42pm. Additionally, expert testimony showed that it is nearly impossible to bypass the phone company's switching system and make a phone call that can avoid being recorded by the system.

The pertinent phone records, as subpoenaed by investigators in 2007, are as follows.[5] At approximately 7:36pm on May 28, 2007, the Defendant received an incoming call from Sergeant Daniel Crossland. Test. Kurt Thielhorn, DN 206, p. 193:21-23. Sergeant Crossland was a solider in Wayne Smallwood's unit and called to tell Wayne to report to a certain location at 6:30am for work the following morning. *Id.*; Test. Daniel Crossland, DN 206, p. 41:1-19. He left a message for Wayne with the Defendant. Test. Kurt Thiehorn, DN 206, p. 193:21-23; Test. Daniel Crossland, DN 206, p. 41:21-25. The next call in the records is an outgoing call to BellSouth that occurred at 7:45pm. Test. Kurt Thielhorn, DN 206, pp. 194:8-195:9. BellSouth provided phone service to the Defendant's residence at the time of the fire. According to the Defendant, she tried to call BellSouth after receiving the threatening phone call, but because May 28, 2007, was Memorial Day, the office was closed. *Id.* at p. 195:7-9. Next, at 7:48pm, the phone records reflect that the Defendant called the military police post at Fort Campbell to report the threatening call. *Id.* at pp. 195:10-196:20. Before the police arrived, the phone records show that at 7:51pm the Defendant called the local post of the Veterans of Foreign Wars ("VFW"),

---

[5] The May 2007 phone records were subpoenaed from BellSouth in June 2007, before the company merged with AT&T. The same records were subpoenaed again a second time in 2009. Although the records for May 2007 subpoenaed in 2007 appear to differ with those records subpoenaed in 2009, the discrepancies were explained by procedural and administrative differences between BellSouth's and AT&T's records, not by any substantive difference.

where her husband had gone for a drink. In the call, the Defendant asked her husband to come home, but he did not return to the Smallwood residence until after 9:00pm that evening. Test. Matt Cummings, DN 205, p. 73:7-10.

In response to her 7:48pm phone call to military police, Officer Steven Miller was dispatched to the Smallwood residence and arrived at approximately 7:55pm. Test. Steven Miller, DN 204, pp. 145:23-146:20. Upon arriving, Officer Miller attempted to determine the source of the threatening call but was unsuccessful. *Id.* at pp. 147:5-148:16. The phone records and Officer Miller's testimony reveal that the Defendant made one out bound call and received one incoming call while Officer Miller was at the home. *Id.* at pp. 149:8-11. The outbound call occurred at 7:56pm and was made to an 800 number, which is consistent with the Defendant's usage of pre-paid phone cards to make long distance calls. Test. Kurt Thielhorn, DN 206, p. 198:7-16. The record does not show who the Defendant called using this 800 number. The incoming call occurred sometime thereafter and was later attributed to Virgil Smallwood, the Defendant's brother-in-law. *Id.* at pp. 198:17-200:6; Test. Steven Miller, DN 204, p. 149:8-11. Thereafter, a series of outbound calls to an 800 number and several incoming calls from the Defendant's mother-in-law, Judy Carlan, occurred. Test. Kurt Thielhorn, DN 206, pp. 200:7-201:23. These calls are listed in the phone records. Although the phone records reflect additional calls throughout the evening, the records are silent as to a call allegedly received by the Defendant at 7:42pm on May 28, 2007. Evidence shows that Sergeant Daniel Crossland called the Defendant at 7:36pm and the Defendant called BellSouth and the military police at 7:45pm and 7:48pm, respectively, to report the threatening call. Despite this evidence, the phone records do not show an incoming call at 7:42pm.

In addition to calling BellSouth, the military police, and her husband, the Defendant also

told her neighbors about the threatening call on at least two occasions that evening. Sometime between 6:00pm and 8:00pm, the Defendant visited Eric and Christine Torres, who lived next door to the Smallwoods. Test. Eric Torres, DN 210, p. 46:3-8. During this visit, the Defendant said that she had received a disturbing phone call. *Id.* at p. 48:14. Later in the evening, sometime between 10:00pm and 11:00pm, the Defendant returned to her neighbors' house and again talked about the threatening call. *Id.* at p. 53:13-18; Test. Christine Torres, DN 209, p. 115:6-9. In all, evidence showed that the Defendant allegedly received a threatening phone call in the early evening of May 28, 2007. Thereafter she called BellSouth, the military police, and her husband to report the call. Finally, she told her neighbors about the phone call on two occasions a few hours before the fire. Despite evidence demonstrating that she told many people about the call, the phone records in this case fail to show that the Defendant actually received a threatening phone around 7:42pm that evening.

In the course of the trial, the Government elicited expert testimony from Jack Randall, a technical architect for finance and billing operations at AT&T. Test. Jack Randall, DN 206, p. 63:1-6. Randall testified concerning the call detail records maintained for the landline at the Smallwood residence. Although BellSouth provided phone service to the Smallwoods in 2007, AT&T merged with BellSouth in 2008, and, as a result, that company possessed BellSouth's call detail and billing records after the merger. Randall provided testimony on three topics. First, he explained the difference between the billing records a customer receives for a landline and the call detail records that AT&T keeps for that same line. *Id.* at pp. 64:8-67:13. Essentially, a call detail record preserves a broad range of information about all incoming and outgoing calls on a particular line. A phone bill, by contrast, only shows the billable transactions on that line. For example, a phone bill will not show local calls made or received on a line if such calls are billed

at a flat rate. A call detail record will, however, show when those local calls were placed and whether they were incoming or outgoing. Thus, a call detail record contains all information recorded in a phone bill, but a phone bill does not include all information present in a call detail record.

Second, Randall testified to the accuracy and completeness of AT&T's call detail records. *Id.* at p. 73:3-20. These records are generated by the phone switches at various locations in AT&T's network and capture traffic on the network. *Id.* at p. 68:14-20. For example, the majority of calls on the Smallwoods' landline were recorded by a switch located in Oak Grove, Kentucky. *Id.* at p. 72:20-24. The "completeness" of the call detail records created by the phone switches is a measurement of AT&T's ability to "collect phone records off of the switches and then distribute those into the rest of the systems that AT&T uses to handle billing." *Id.* at p. 73:11-12. Randall testified that for the BellSouth region in May of 2007, the company collected 11.6 billion call detail records. *Id.* at p. 73:13-14.[6] Of those calls, the company only failed to account for 61,000 calls. *Id.* at p. 73:16-18. In other words, for the BellSouth region in May of 2007, the company's call detail records were 99.99947% complete. *Id.* at p. 73:14-18. Most significantly, Randall testified that none of the lost calls occurred on any of the switches servicing the Smallwoods' landline. *Id.* at pp. 73:18-22, 75:1-8. "The switch [collecting call detail records for the Smallwoods' landline] collected cleanly for the entire month, and there's no issue at all on that particular device." *Id.* at p. 75:6-8. Therefore, not only were the company's call detail records 99.99947% complete for the region, Randall testified that the

---

[6] Randall's testimony refers to "May of 2009," but upon review of the record, the Court finds that this was simply an inadvertent misstatement. The parties subpoenaed the Smallwoods' May 2007 phone records in 2007 and again in 2009. During Randall's testimony, he referred to the different years the records were subpoenaed, and the perceived differences between those records, but the period covered by those subpoenas never changed. The subpoenas only covered the phone records created in and around May 2007. Accordingly, when Randall refers to "May of 2009" in his testimony, the Court perceives that this was simply an inadvertent misstatement and he actually meant "May of 2007."

records were 100% complete for the particular switch recording calls on the Smallwoods' landline. *Id.* at p. 124:5-18. Randall also testified that in fifteen years of experience, he has never observed a phone switch fail to record only a single call. *Id.* at p. 75:19-21. Rather, in circumstances where call detail records were not generated by a switch, the losses occurred across "a large swipe of time that usually covers minutes to sometimes hours off a particular phone switch." *Id.* at p. 75:17-19. Therefore, Randall concluded that the likelihood of the Defendant receiving a threatening phone call at 7:42pm on May 28, 2007, and that call not being recorded in the call detail records is "[e]xtremely small." *Id.* at p. 182:16-19.

Third, Randall testified as to whether it is possible to bypass the phone switches and make a phone call that will not be recorded by AT&T's call detail system. When first retained by the Government as an expert witness, Randall did not believe that it was technologically possible to circumvent the phone switching system. *Id.* at pp. 119:9-120:11; Test. Jack Randall, DN 211, pp. 23:19-24:25. After investigating the issue, however, he determined that it is possible to route a call around the phone switches but that it is extremely difficult to accomplish. In fact, Randall testified that, to his knowledge, only four AT&T employees have the ability to route a call around a phone switch in such a way that the call will not be captured in the call detail records. Test. Jack Randall, DN 206, p. 90:7-10.

In contrast to Randall's testimony, the Defendant elicited testimony from Manfred Schenk and Scott Neely that one could use a lineman's handset, commonly referred to as a "butt set," to accomplish what Randall thought impossible. *See* Test. Manfred Schenk, DN 209, pp. 137-172; Test. Scott Neely, DN 210, pp. 21-36. Schenk testified that one could use a lineman's handset to "tie into" an existing phone line and make a call that would not be captured or recorded by a phone switch because such a device cannot be billed. Test. Manfred Schenk, DN

209, pp. 160:180-25. According to Schenk a call made from a handset does not leave a billable or recordable record "because there's no connection back to the switch. And even if a record were generated at the switch, it would not be sustained in the area of billing, and so, therefore, there would never be a call detail record generated because there is no billing." *Id.* at p. 171:6-10. Neely testified to the general ease with which one could use a lineman's handset and how it was routinely used in the telecommunications industry. Test. Scott Neely, DN 210, pp. 22:4-26:16.

Through cross-examination and Randall's rebuttal testimony, the Government attacked the reliability of Schenk and Neely's testimony. First, Neely freely admitted on cross-examination that he did not know whether a call made using a lineman's handset would generate a call detail record in an AT&T phone switch. *Id.* at p. 33:16-20. He simply testified that a lineman's handset was easy to use but had no knowledge regarding whether calls made with such a device would be captured by a phone switch. *Id.* Second, in rebuttal to Schenk's statements, Randall testified that calls made using a lineman's handset would be recorded by the phone switch but that such calls would merely mimic the line to which the device was attached. Test. Jack Randall, DN 211, pp. 7:17-8:6. Accordingly, Randall testified that Schenk wrongly concluded that one could make an unrecorded call using a lineman's handset. As explained by Randall:

> [L]et's say I were to clip [the handset] into my next-door neighbor's house, onto their box. If I were to then call my home, it would then look exactly like they had called from inside their home. . . . [The call] would go through the local end office switch, which would then record the call and the fact that it took place.

*Id.* at pp. 7:25-8:6. Therefore, even where a lineman's handset is used, the call will still be recorded by the phone switch. The phone switch will record that a call occurred, but it will simply appear that someone else made the call. *Id.* at p. 8:18-22. In order to make an

unrecorded call, one would have to be trained to disconnect the switch itself and still generate a viable call. *Id*. at pp. 15:6-16:6. Randall reiterated that there are few AT&T employees with the skill, knowledge, and ability necessary to bypass a switch entirely and make a call that would not be captured by the call detail records. *Id.* at pp. 15:20-16:6. Employees receive no training on this technique. *Id.*

Taken in a light most favorable to the prosecution, evidence concerning the threatening phone call allegedly received by the Defendant is as follows. The subpoenaed phone records show that Sergeant Daniel Crossland called the residence at 7:36pm and that the Defendant made outgoing calls to BellSouth and the military police station at 7:45pm and 7:48pm, respectively. Between these events, however, no record of a 7:42pm incoming call exists. Records exist for other calls that the Defendant made and received, but again, the phone records are silent as to an incoming call received at 7:42pm.

Also, Jack Randall testified that for May 2007, BellSouth possessed call detail records for 99.99947% of all calls made in the region that includes the Smallwoods' residence. More importantly, he testified that the particular switch that would have generated call detail records for the Smallwoods' landline had no malfunctions or errors during this period that would have prevented it from generating the records. He also stated that in fifteen years of experience he had never seen a phone switch fail to record a singular call. If a switch failed, it stopped recording calls for minutes or hours, not for one isolated call.

Taken together, the phone records and testimony presented show that it is extremely unlikely that the Defendant received a threatening phone call on May 28, 2007, at 7:42pm. This fact, combined with the Defendant's purchase of a gas can on the day before the fire and other evidence considered below, was sufficient evidence upon which a reasonable jury could find the

Defendant guilty beyond a reasonable doubt.

## C.

Next, the jury heard evidence about the location of the Defendant's burns and the significance of her statements that she saw a "blue flame" at the time of the fire. From the evidence presented, the jury could reasonably conclude that the Defendant was present at the source of the fire's ignition and not on the stairs of the residence as she claimed in statements to investigators.

As a result of the fire the Defendant sustained burns on her legs and right arm. Test. Jeffrey Guy, DN 208, pp. 13:10-11, 22:12-14. She was treated for these injuries at Vanderbilt University Medical Center by Dr. Jeffrey Guy. *Id.* at p. 13:3-6. The burns on her legs consisted of third-degree burns that stretched from her knees to her toes and required surgery to repair. *Id.* at pp. 13:12-14:10. These burns were located predominately on the fronts of her legs, although one of the burns "kind of draped around the back of one of the legs." *Id.* at p. 13:19-20. Although there was nothing extraordinary about the Defendant's burns, her treating physician testified that "the source of the energy [causing the burns] seemed to be anterior to the patient." *Id.* at pp. 32:13-33:9. This means that the Defendant's injuries were caused by a fire in front of her rather than behind, or posterior, to her.

In interviews with investigators after the fire, the Defendant described how she sustained her injuries. According to the Defendant, she fell asleep in her daughters' bedroom on the second floor of the residence at approximately 11:00pm. Test. Matt Cummings, DN 205, pp. 75:19-76:9. Sometime thereafter she was awoken by a loud crashing on the first floor. *Id.* at p. 75:19. She immediately went to investigate but only proceeded about halfway down the stairs before she saw several fires in the living room. *Id.* at p. 75:20-21. At that point the fire came up

the stairs, her legs began to burn, and she ran back to the bedrooms and proceeded with efforts to evacuate her children from the residence. *Id.* at pp. 75:22-76:7; Test. William Barker, DN 205, p. 36:7-15.

The Defendant was interviewed multiple times during the course of the investigation into the fire. The first of these interviews occurred two days after the fire, on May 31, 2007, while she was still hospitalized. Test. Matt Cummings, DN 205, p. 68:1-11; Test. William Barker, DN 205, p. 28:11-22. At this time, investigators did not suspect the Defendant as the perpetrator of the arson. Test. Matt Cummings, DN 205, p. 68:19-21. Rather, they were conducting a routine "victim interview" in order to learn more about the circumstances of the fire. *Id.* at p. 68:9-15. The Defendant told investigators that as she came down the stairs she saw fire in the living room. Most significantly, she described the fire as a "creek of fire" accompanied by "blue flames." *Id.* at pp. 77:10-78:10; Test. William Bark, DN 205, p. 40:1-7.

In a subsequent interview on June 6, 2007, the Defendant was less confident about the color of the fire. At that time, she told investigators that the fire could have been blue but may have also been orange, that she simply was not sure. Test. Kurt Thielhorn, DN 205, p. 195:18-23. In her third interview on June 14, 2007, however, the Defendant definitively described the fire as "blue." *Id.* at p. 193:23-194:19. She mentioned the color of the fire voluntarily, and it was not elicited by investigators on June 14. *Id.* at pp. 196:24-197:2.

To explain the significance of the Defendant's observation of a blue flame, the Government presented expert testimony from Dr. John DeHaan, a forensic scientist specializing in the investigation and reconstruction of fires and explosions. Test. John DeHaan, DN 208, p. 76:12-17. In particular, Dr. DeHaan has studied how vapors from ignitable liquids, like gasoline, behave in various environments. *Id.* at p. 82:4-88:22. When gasoline is poured on a surface, it

immediately begins to evaporate, but, because the vapors are heavier than air, they only rise a short distance above the surface. *Id.* at p. 82:9-21. The vapors then spread horizontally until they reach the walls of the container or room in which the gasoline is poured. *Id.* at pp. 82:22-83:11. When an ignition source is introduced, the vapors always burn first rather than the liquid itself. *Id.* at p. 87:2-3. The ignition of the vapors causes "a bubble of flame extending out in all direction from that ignition source moving through the vapor." *Id.* at p. 87:23-24. This initial flash or flame front moves quickly, up to ten feet per second at ordinary temperatures. *Id.* at p. 87:25-88:1. Blue flames can be observed as the fire consumes the gasoline vapors. *Id.* at p. 89: 8-19. According to Dr. DeHaan, blue flames represent a "kind of very lean . . . combustion state . . . in advance of the yellow flame that we normally associate" with fire. *Id.* at p. 89:13-15. A blue flame will occur at the leading edge of a fire when it is first ignited but "only exists a second or two, and then its replaced by the yellow flame." *Id.* at p. 90:1-6. One looking at the flame front can see a "transitory blue, kind of ghostly-looking flame." *Id.* at p. 89:18-19. As shown to the jury in a video of an experiment conduct by Dr. DeHaan, the initial flame front that flashes through the vapor pool is not capable of producing serious injury because it is extremely brief. *Id.* at pp. 94:15-97:18, 100:13-20.

Based on his expertise in fire science and after reviewing the evidence in this case, Dr. DeHaan concluded that the burns to the Defendant's legs were not consistent with her description of events. *Id.* at pp. 81:20-82:3, 108:20-109:14. Dr. DeHaan gave two reasons for his conclusions. First, evidence showed that the stairs on which the Defendant claims she was burned where bordered on the Defendant's right by the apartment's outside wall and her left by a solid half-wall extending up the length of the stairs. Therefore, if the Defendant was on the stairs as she claimed, her legs would have been shield by the half-wall. *Id.* at pp. 111:23-112:10.

Additionally, she sustained burns on her right arm, which would have been against the external wall and the furthest part of her body from the fire as she descended the stairs. *Id.* at pp. 112:16-113:5. Second, the burns the Defendant suffered were inconsistent with her claim of being briefly exposed to the fire on the stairs. Although the "initial flash could have produced a brief, very brief, wash of flame part way up the stairs, even possibly reaching her, but that would be an extremely brief duration and it would not be possible of inducing the serious burns on the fronts of her legs." *Id.* at p. 109:7-11, 249:16-251:2. Rather, her injuries were consistent with "facing the fire and then moving away from it." *Id.* at p. 114:6-7. Dr. DeHaan agreed that the Defendant's burns were consistent with being at or near the floor level of the fire and were "wholly inconsistent with her own statement that she was three or four steps from the bottom on of the stairs[.]" *Id.* at p. 114:8-18. She would have needed to be much closer to the fire to incur the injuries she sustained. *Id.* at p. 251:3-14.

In summary, evidence was presented that showed that the Defendant's description of the fire was inconsistent with the injuries she sustained. First, she told investigators on more than one occasion that she saw a blue flame while on the stairs, even though the living room was already on fire. As shown by the testimony of Dr. DeHaan, blue flames are transitory and are only observable for a few second after the initial ignition. Second, the Defendant's injuries were severe and were inconsistent with exposure to a flash of fire up the stairs as she described. Finally, the placement of her injuries was inconsistent with her statements that she was on the stairs at the time she was burned. She suffered third-degree burns on the lower half of her legs, which would have been shielded by the half-wall if she was on the stairs. Additionally, her right arm was burned, even though it would have been the furthest part of her body from the fire if she was on the stairs. This evidence, coupled with the gas can, the missing phone call, and the other

evidence discussed below, was sufficient for a reasonable jury to conclude beyond a reasonable doubt that the Defendant committed the crime charged.

**D.**

In her motion for judgment of acquittal the Defendant contends that the record lacks evidence of a motive or reason for her to maliciously burn her residence. Contrary to her arguments, evidence was presented at trial upon which a reasonable jury could conclude that the Defendant had a reason to commit the crime charged.

First, testimony from various witnesses showed that the Defendant's relationship with her husband was tumultuous. Wayne was described as "domineering" and verbally abusive to the Defendant. Test. Kurt Thielhorn, DN 205, p. 185:7-15. He was also said to be "in control" of the Smallwoods' household and responsible for any abuse that happened there. Test. Eric. Torres, DN 210, p. 67:17-24. The Smallwoods' neighbors often heard the couple arguing through the walls of their apartment. *Id.* at pp. 56:8-57:4. Christina Torres, a neighbor and member of a support group to which the Defendant belonged, personally heard Wayne verbally abuse the Defendant. Test. Christina Torres, DN 209, p. 106:5-7. Limited evidence was also presented that Wayne physically abused the Defendant prior to their marriage. Test. Kurt Thielhorn, DN 205, pp. 194:18-185:6.

Second, other evidence demonstrated that Wayne engaged in actions that adversely affected the family. Thomas Boland, who had been Wayne's commanding officer in the Army, testified that after the fire the Defendant told him that Wayne used drugs and drank alcohol in excess during the family's weekend trips to Georgia. Test. Thomas Boland, DN 206, pp. 47:18-48:1, 62:4-9. Additionally, testimony showed that Wayne was verbally abusive to the Defendant's son, Sam. Test. Christina Torres, DN 209, p. 107:7-23. Wayne, who was not Sam's

biological father, "was never very nice to Sam. [Wayne] was very verbally abusive, would ignore [Sam] and push him off all the time." *Id.* at p. 107:16-17.

Third, the jury heard evidence that Wayne misused the family's finances. Prior to the fire, the Defendant told Wayne's commanding officer that her husband was "spending money carelessly and that [the family] was hurting financially." Test. Thomas Boland, DN 206, p. 46:6-8. Because of his spending habits the family was unable to buy certain necessities, like diapers for the children. *Id.* at p. 46:9-12. Wayne was described as "blowing" the family's money on himself. *Id.* at p. 49:8-20. The Defendant expressed concern about the family's finances to a group of Army wives that also dealt with similar financial constraints. Test. Christina Torres, DN 209, pp. 105:7-17. In particular, she and the other wives sometimes complained that they could not leave their marriages because of a lack of money. *Id.* at p. 113:6-9.

Finally, the jury heard testimony that the Defendant wanted Wayne to change. *Id.* at pp. 105:21-106:1. The Defendant did not like the way Wayne conducted himself and wanted him to alter his lifestyle. *Id.* at p. 130:1-25. Although the Defendant never expressly stated that she was going to attempt to proactively change Wayne, she wanted him to change nonetheless. *Id.* at pp. 131:4-132:4.

Whether because of verbal and physical abuse, Wayne's financial neglect, or his other domineering acts, sufficient evidence was presented during trial upon which a reasonable jury could conclude that the Defendant had motive and reason to commit the crime charge. The Defendant's arguments to the contrary are without merit.

## CONCLUSION

Defendant Billi Jo Smallwood moved the Court to enter a judgment of acquittal on grounds that the evidence presented at trial was insufficient for any reasonable jury to find her

guilty beyond a reasonable doubt of violating 18 U.S.C. § 844(i).  In reviewing the record as a whole and taking the evidence in a light most favorable to the prosecution, the Court finds that substantial and competent circumstantial evidence was presented upon which any reasonable jury could find the Defendant guilty beyond a reasonable doubt.  Accordingly, having considered the matter and being sufficiently advised,

**IT IS HEREBY ORDERED** that the Defendant's motion for judgment of acquittal is **DENIED**.