**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:08-CR-00038-TBR**

UNITED STATES OF AMERICA                                    PLAINTIFF

v.

BILLI JO SMALLWOOD                                          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Defendant's motion for new trial. Def.'s Mot., Docket Number ("DN") 225. The Government has responded. Gov't Resp., DN 239. The Defendant has not replied and the time to do so has now expired. Having considered the matter and being sufficiently advised, the Defendant's motion is DENIED.

**I.**

On September 22, 2010, Defendant Billi Jo Smallwood (hereinafter "Defendant" or "Billi Jo") was charged with a single count of violating 18 U.S.C. § 844(i). Superseding Indictment, DN 108, p. 1. Section 844(i) criminalizes the malicious destruction or the attempted destruction of any building in or affecting interstate commerce by means of fire. The statutorily prescribed penalties associated with a violation of § 844(i) vary if another person is injured or dies as a direct or proximate result of the fire. *See* 18 U.S.C. § 844(i). The superseding indictment charged that, as a direct and proximate result of the fire, the Defendant caused the death of two of her minor children. Superseding Indictment, DN 108, p. 1. On June 28, 2012, after a ten-day jury trial, the Defendant was convicted of violating § 844(i). Jury Verdict, DN 194. She currently awaits sentencing.

The Defendant raises twelve separate grounds for new trial. Significantly, the Defendant does not argue that the jury's verdict was against the weight of the evidence or that that newly

discovered evidence warrants a new trial. Instead, the Defendant assigns various procedural and evidentiary errors to the trial proceedings and seeks a new trial on "other grounds." The Court will consider each ground for new trial in the order raised by the Defendant.

## II.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for new trial must state the grounds on which it is made. Fed. R. Crim. P. 47(b). If the motion is not based on newly discovered evidence, it must be filed "within 14 days after the verdict or finding of guilty" or within such time as the court allows. Fed. R. Crim. P. 33(b)(2).

A motion for new trial presumes that the verdict was valid, and the defendant bears the burden of proving that a new trial should be granted. 3 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 581 (4th ed. 2012). When the motion does not assert that the verdict was against the weight of the evidence or does not present newly discovered evidence, it is based on "other grounds." *See United States v. Munoz*, 605 F.3d 359, 373-74 (6th Cir. 2010). "[C]ourts have interpreted [Rule 33] to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (citation omitted). In such circumstances, "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (citation omitted).

## III.

The Defendant assigns twelve separate errors to the trial proceedings. As stated above, she does not argue that the verdict was against the weight of the evidence and she does not ask

the Court to consider newly discovered evidence. In light of the posture of the Defendant's motion, the Court considers each ground asserted for manifest injustice or some other error of sufficient magnitude that would require reversal on appeal.

**1.**

The Defendant first asserts that the evidence presented at trial was insufficient to support her conviction. In raising this as a ground for new trial, the Defendant "incorporates by reference [her] motion for judgment of acquittal which fully sets forth this argument." Def.'s Mot., DN 225, p. 1. The Court previously denied the motion for judgment of acquittal brought pursuant to Federal Rule of Criminal Procedure 29. *See United States v. Smallwood*, No. 5:08-CR-38, 2012 WL 6026499 (W.D. Ky. Dec. 4, 2012). Because the Court has already given full consideration to the Defendant's Rule 29 motion in a separate opinion, it will not do so again in the present matter.

The Court notes that the Defendant's first ground for new trial is that the evidence was insufficient to sustain her conviction, not that the verdict was against the weight of the evidence. An important distinction exists between these positions. *See Tibbs v. Florida*, 457 U.S. 31 (1982) (explaining the difference between granting a new trial because the verdict was against the weight of the evidence versus granting a judgment of acquittal because the evidence was insufficient to sustain a conviction). The Defendant only raises the insufficiency argument. At no time has she argued that the verdict was against the weight of the evidence.

**2.**

Next, the Defendant argues a new trial is warranted because the jury was shown a picture of a knife recovered from the scene of the fire. According to the Defendant, the picture of the knife was prejudicial because it left an impression that was suggestive of tool mark evidence

previously excluded by the Court.

      The knife was shown to the jury during the testimony of Sharon Salinas, a special agent of the U.S. Army Criminal Investigation Division who investigated the fire at the Smallwood residence. Test. Sharon Salinas, DN 204, pp. 65:21-142:25. Salinas was called to testify about what she saw and observed when she inspected the crime scene. Her investigation revealed that the tires on the Smallwoods' vehicle had been slashed and that threatening messages had been scratched into its sides. *Id.* at p. 70:19-23. Shortly after describing the condition of the vehicle, she was asked to identify pictures of the crime scene. During this process she was presented with a picture of the knife at issue. *Id.* at p. 76:7-9. When shown the picture, she responded, "That is a knife that was recovered from a desk that was taken out of the house." *Id.* The defense immediately objected and a bench conference was held before the Court. *Id.* at pp. 76:11-77:16. During the conference prosecutors were instructed to remove the picture from the group of photographs shown to Salinas. *Id.* at p. 76:19. All of the photographs identified by Salinas were later introduced into evidence, save the picture of the knife. *Id*. at pp. 100:25-101:10. It was removed and never became part of the evidentiary record. *Id.*

      Prior to the trial, the Court excluded the Government's expert witness for tool marks, who sought to testify that the knife recovered from inside the Defendant's residence was the same knife used to vandalize the vehicle. *See United States v. Smallwood*, No. 5:08-CR-38, 2010 WL 4168823, *9-*13 (W.D. Ky. Oct. 12, 2010) *aff'd* 456 Fed. App'x 563 (6th Cir. 2012). The Defendant claims that showing the knife in close proximity to testimony about the car was reversible error because it improperly suggested that the knife had been used to damage the vehicle and that a new trial is the only appropriate remedy for this error.

      The picture of the knife was removed from the photographs identified by Salinas and was

never introduced into evidence for examination by the jury.  Additionally, the Court offered to admonish the jury at the time of the Defendant's objection but cautioned the defense that doing so might unnecessarily draw more attention to the picture than its momentary presentation in court.  Trial Tr., DN 204, pp. 76:25-77:2.  The defense never requested the admonition.

In a conference of the parties held the following day, the Court concluded that defense counsel could ask certain questions about the knife if it fit their trial strategy but again cautioned that the knife was displayed to the jury for less than fifteen seconds during a two-week trial, that it was not introduced into evidence, and that no evidence or testimony connected the knife and the vehicle.  Trial Tr., DN 205, pp. 5:16-7:17.  Counsel for defense declined to ask any questions about the knife, and it was never mentioned or displayed again during the course of the trial.  The brief display of the picture of the knife worked no prejudice on the Defendant and was not an error of sufficient magnitude to warrant a new trial.

**3.**

Next, the Defendant seeks a new trial because of alleged prosecutorial misconduct during closing arguments.  More specifically, the Defendant claims the Government erred by inferring that the Defendant was motivated to commit this crime so she could collect the proceeds of her husband's life insurance policy.  The Defendant asserts that this argument was improper because the Government failed to present evidence showing she had knowledge of the policy.

The Sixth Circuit has adopted a two prong test for determining whether prosecutorial misconduct warrants a new trial.  *See United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994).  A court must first "consider whether the prosecutor's conduct and remarks were improper." *United States v. Carter*, 236, F.3d 777, 785 (6th Cir. 2001) (citing *Carroll*, 26 F.3d at 1387).  Only if the court determines that the remarks were improper must it then decide whether

those remarks were flagrant. *Id.* To determine whether improper remarks were flagrant, the court must weigh four factors: "(1) whether the conduct and the remarks of prosecutors tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* (citing *Carroll*, 26 F.3d at 1385).

A new trial is not warranted because the prosecutor's remarks about the life insurance policy were not improper under the first prong of the *Carroll* analysis. The Defendant's argument that no evidence imputed her with knowledge about the life insurance policy is not supported by the record. During trial the Government introduced a copy of the insurance policy at issue. Test. Kurt Thielhorn, DN 205, pp. 131:2-132:11. The policy was issued to her husband by the Army and clearly listed the Defendant as its beneficiary. *Id.* at p. 132:4-5.

To support her argument that she had no knowledge of the policy, the Defendant presented the testimony of Christina Torres. Test. Christina Torres, DN 209, pp. 96:17-134:22. Torres, an Army wife who participated in a support group with the Defendant, testified that neither she nor the Defendant knew about the life insurance policies the Army provided to their husbands. *Id.* at p. 113:10-15. She did state, however, that she eventually learned about her husband's policy after he was deployed overseas for a second time. *Id.* at p. 114:2-5.

Conflicting testimony and evidence exists regarding whether or not the Defendant knew about the life insurance policy. On one hand, the Government introduced a copy of the policy, which named the Defendant as its beneficiary. On the other, testimony by Christina Torres indicates that the Defendant did not know about the policy. "Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996) (citation omitted). It is

well-established that "the prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (citations omitted).

Both sides presented evidence in support of their positions on this issue. Therefore, it was reasonable for the prosecutor to infer that the Defendant knew about her husband's life insurance policy because she was its named beneficiary and because her husband was deployed overseas on at least one occasion. The prosecution's remarks during closing arguments were not improper and were not an error of sufficient magnitude to warrant a new trial.

## 4.

Next, the Defendant asserts that a new trial is warranted because the Court prejudicially limited the cross-examination of Dr. John DeHaan, the Government's cause and origin expert for the fire. The Defendant assigns three errors to the limitations the Court placed on the cross-examination of Dr. DeHaan.

First, the Defendant argues that the Court erred when it prohibited the defense from showing the jury a video interview of Dr. DeHaan produced by the television program *20/20*. In the interview, Dr. DeHaan is questioned about an expert opinion he formed and then retracted in *Louisiana v. Gutweiler-Hypes*, another case in which a mother was accused of arson resulting in the death of her children. The Defendant sought to use segments of this interview to impeach Dr. DeHaan's credibility. The Court reviewed and ultimately prohibited the Defendant from showing the interview. *See* Trial Tr. DN 208, p. 121:14-20. The Court found that the segments lacked any impeachment value, were accusatory in nature, and were misleading. *Id.* at pp. 120:10-13, 121:14-17, 159:7-13.

Federal Rule of Evidence 403 allows a court to exclude relevant evidence if its "probative

value is substantially outweighed by a danger of . . . confusion of the issues [or] misleading the jury." The Court properly excluded the *20/20* interview of Dr. DeHaan pursuant to Rule 403 because the interview involved his opinions and involvement in a case wholly unrelated to the Defendant. After reviewing the segments, the Court determined that there was a substantial likelihood that the jury would be misled and confused if portions of the interview were introduced into evidence. Accordingly, the Court did not err by excluding the interview.

Second, the Defendant claims the Court erred by limiting the scope of questions she could ask Dr. DeHaan concerning the *Gutweiler-Hypes* case. The Defendant sought to question Dr. DeHaan about that case in order "to establish that Dr. DeHaan's reports were inaccurate, his conclusions were often changed (and he failed to inform the prosecution), his original opinions were often redacted and didn't reach any level of scientific certainty." Def. Mot., DN 225, p. 6. Upon review, the Defendant's objections on this issue are unclear to the Court. After a lengthy evidentiary hearing concerning the questions the Defendant sought to ask Dr. DeHaan about his opinions in the *Gutweiler-Hypes* case, the Court only limited cross-examination in two ways. First, the Court ruled that the Defendant could not elicit testimony that three young children died in *Gutweiler-Hypes*. Trial Tr., DN 208, pp. 157:8-158:11, 202:22-203:5, 204:4-15. Second, the Court barred the Defendant from showing that the *Gutweiler-Hypes* defendant may have been held in pre-trial detention for an extended period of time. *Id.* at pp. 157:8-158:11. The Court was clear, however, that the Defendant could ask Dr. DeHaan about his inconsistent statements in *Gutweiler-Hypes* and whether he had previously altered or reversed his opinions in that or any other cases as a result of errors in his opinions or changes in scientific understanding. *Id.* at pp. 158:8-9, 204:10-15. The record reflects that the defense questioned Dr. DeHaan about his opinions and involvement in *Gutweiler-Hypes* at some length. *Id.* at pp. 198:15-206:3, 223:16-

224:1.  In particular, the Defendant was able to question Dr. DeHaan about altering, changing, and withdrawing portions of his opinion in that case.  *Id.* at pp. 198:15-202:1.  In her motion for new trial, the Defendant claims that the Court's limitations on Dr. DeHaan's cross-examination were prejudicial because they prevented her from "expos[ing] this witness as a faulty expert by properly questioning the expert's credibility."  Def.'s Mot., DN 225, p. 6.  Upon review of the record, it is clear that the Defendant was able to elicit testimony from Dr. DeHaan that he had changed his expert opinion in *Gutweiler-Hypes*.  The Court allowed this testimony, which cuts directly to the credibility of the opinions he offered in the present case.  The Court did not err by placing restrictions on the questions the Defendant could ask Dr. DeHaan about the *Gutweiler-Hypes* case.

Third, the Defendant argues that the Court erred by not allowing cross-examination of Dr. DeHaan about the date the Government planned to indict the Defendant.  During the trial it was alleged that Amber Wojnar, a U.S. Army investigator, wrote a report in January of 2008 stating that the Government planned to indict the Defendant on February 13, 2008.  Trial Tr., DN 204, pp. 129:1-135:20.  Dr. DeHaan inspected the scene of the crime on February 11, 2008.  The Defendant sought to question Dr. DeHaan about the date of his inspection in relation to the Government's plan to indict the Defendant for the purpose of showing that Dr. DeHaan's "conclusions were merely a rush to judgment or a rubber stamp of the fact that the government had already determined her guilt prior to his arrival."  Def. Mot., DN 225, p. 6.  The Court excluded any testimony about the Government's plan to indict the Defendant on February 13, 2008, because its probative value was "very slight."  Trial Tr., DN 204, p. 134:12.  Additionally, the Court found that the Defendant had taken Wojnar's January 2008 report "out of context" because the Defendant was not actually indicted until November of 2008.  *Id.* at pp. 134:20-

135:1; *see* Indictment, DN 1. The Court was concerned that by allowing the Defendant to question the timing of the Government's indictment, the trial would focus on the Government's "deliberative process about the decision to indict her[.]" Trial Tr., DN 204, p. 134:21-23. That decision was not the issue on trial. *Id.* at p. 134:24. Accordingly, the Court properly excluded any questions on that topic.

In all, the Court's decision to limit the cross-examination of Dr. DeHaan on the issues discussed above was not an error of sufficient magnitude to warrant a new trial.

**5.**

Next, the Defendant contends that the Government's failure to produce photographs of the crime scene taken by the Government's expert, Dr. John DeHaan, on February 11, 2008, violated the expert disclosure rule and warrants a new trial. This argument is without merit because non-disclosure did not violate the expert disclosure rule and the photographs were not material to the preparation of the Defendant's case.

Upon request by a defendant, the Government must provide a written summary of any testimony or opinion the Government seeks to elicit from an expert witness. Fed. R. Crim. P. 16(a)(1)(G). This summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.* Notably, Rule 16 only requires that the Government provide the defendant a summary of the expert's opinion and the basis of that opinion, not the materials used to form it.

In the present case, Dr. DeHaan prepared his one and only expert report on October 27, 2007, approximately five months before he took the photographs at issue. This report and Dr. DeHaan's opinions contained therein were provided to the Defendant prior to trial and were the subject of a *Daubert* hearing held before the Court on August 24, 2010. *See Daubert* Hearing

Tr., DN 101. The Court ultimately permitted some of Dr. DeHaan's opinions and excluded others. *See Smallwood*, 2010 WL 4168823, at *2-*8. In all, Dr. DeHaan's report and opinions were subject to repeated cross-examination and testing during the *Daubert* hearing and again at trial. There is no indication in any of these proceedings that he relied upon the photographs taken on February 11, 2008, when forming his opinions. He could not have relied on those photographs when writing his report because he did not take the pictures until *after* the report was written. Accordingly, the expert disclosure rule was not violated by the Government's failure to turn these pictures over to the Defendant.

Even though Rule 16's expert disclosure requirements were not violated, the Government, upon a defendant's request, is also required to produce photographs and other evidence in the Government's possession that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Despite the fact that the photographs at issue were not turned over to the Defendant before trial, the Court finds that non-disclosure was not prejudicial because the photographs were not "material to preparing the defense." Additionally, it must be noted that Dr. DeHaan's photographs were not prejudicial to the Defendant because the Government did not rely on them during trial, and they were never shown or otherwise presented to the jury.

The Government attached Dr. DeHaan's February 11, 2008 photographs to its response to the Defendant's motion for new trial on this issue. *See* Attachments to Gov't Resp., DN 240. The Court has reviewed these photographs and finds that they were not material to preparing the defense because they are not substantively different from other pictures of the crime scene the Defendant possessed prior to and during trial. The photographs show the burned interior of various rooms of the Defendant's residence. Similar photographs from other investigators were turned over to the Defendant prior to trial. The Defendant has not pointed to any characteristic

that distinguishes Dr. DeHaan's photographs from those in her possession prior to trial or that made his photographs material to preparing a defense when compared to those already in her possession. Evidence is "material to preparing the defense" where there is an "indication that pre-trial disclosure would have enabled the defendant to 'alter the quantum of proof in his favor[.]'" *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)). "In assessing materiality, we consider the logical relationship between the information withheld and the issues in the case, as well as the importance of the information in light of evidence as a whole." *Id.* Given that Dr. DeHaan's photographs are substantively indistinguishable from other photographs held by the Defendant long before trial, those particular pictures were of little probative value when considered in light of the evidence as a whole. The Government's failure to disclose the photographs did not violate the expert disclosure rule and such photographs were not material to preparing the Defendant's case. As such, failure to produce the photographs was not an error of sufficient magnitude to warrant a new trial.

**6.**

Next, the Defendant asserts that the Court erred when it prohibited the Defendant from cross-examining the Government's expert witnesses concerning a statement made by the Defendant's husband, Wayne Smallwood. According to the Government, Wayne informed prosecutors that at some unknown point before the fire he took down the apartment's smoke detectors because they were "hanging by wires in the apartment and unsightly." Gov't Resp., DN 239, p. 13. The Government disclosed Wayne's statement to the Defendant pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The Defendant then sought to introduce Wayne's statement during the cross-examination of Dr. John DeHaan and ATF Agent

Kurt Meuris, the Government's expert witnesses.

The Court did not err by prohibiting the Defendant from introducing Wayne's statement during the cross-examination of Dr. DeHaan because Dr. DeHaan offered no opinion about the smoke detectors during direct examination. On cross-examination, Dr. DeHaan stated that, as an arson investigator, he would want to know if anyone was responsible for disconnecting the smoke detectors in the apartment. Test. John DeHaan, DN 208, p. 213:19-24. After this testimony, the Government peremptorily objected to the introduction of Wayne's statement on grounds that it was hearsay. *Id.* at p. 214:1-16. During a bench conference on the issue, the defense argued that Wayne's statement was not hearsay because it was not being introduced for the truth of the matter asserted. *Id.* at p. 221:4-5. Instead, it was being used to impeach Dr. DeHaan's credibility because the Government did not disclose Wayne's statement to Dr. DeHaan and, as a result, his opinion was untrustworthy because he did not possess all the necessary and pertinent information when forming his opinion. *Id.* The Court excluded the statement because Dr. DeHaan offered no opinion about the smoke detectors on direct examination. *Id.* at p. 221:6-14.

The Defendant also argued that Wayne's statement was admissible during Dr. DeHaan's cross-examination under Federal Rule of Evidence 703. Rule 703 provides that experts may rely on otherwise inadmissible evidence when forming their opinions if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. The defense argued that they could question Dr. DeHaan about Wayne's statement under Rule 703 because they were allowed to examine the substance of any evidence, even inadmissible evidence, relied upon by the expert in forming his opinion. The Defendant's argument under Rule 703 suffered from a fatal flaw; Dr. DeHaan offered no opinion about the

smoke detectors during direct examination. Although his expert report contained an opinion that that the smoke detectors had been intentionally removed before the fire, that opinion was ultimately excluded by the Court because it was "purely speculation." *See Smallwood*, 2010 WL 4168823, at *6. Accordingly, Dr. DeHaan offered no opinion about the smoke detectors during direct examination and therefore the Defendant could not question him on Wayne's inadmissible statement when no opinion relying on that statement was ever offered into Court.

The Defendant claims that the Court also erred when it prevented her from questioning ATF Agent Kurt Meuris about Wayne's statement. This argument is unavailing because the Court ultimately allowed the defense to cross-examine Agent Meuris about Wayne's statement. On direct examination, Agent Meuris testified that the smoke detectors had been removed. Test. Kurt Meuris, DN 207, pp. 79:14-22, 80:23-81:16. On cross-examination, Agent Meuris stated that, as a fire expert, he would want to know the positioning, presence, and condition of the smoke detectors when forming his opinion. *Id.* at pp. 95:5-96:11. After this statement a bench conference was held in which the defense argued that they could appropriately question Agent Meuris about Wayne's statement. *Id.* at pp. 96:19-100:8. The Court excluded such questions. *Id.* at p. 96:19-23.

The parties renewed arguments on this issue after the testimony of Dr. DeHaan. Trial Tr., DN 208, pp. 280:16-282:10. During these arguments the Court concluded that the Defendant could question Agent Meuris about Wayne's statement. *Id.* at p. 282:9. The following day, Agent Meuris was recalled to testify at trial, and during cross-examination he was specifically asked about Wayne's statement:

> Defense Counsel: Regarding the taking down of the smoke detectors, were you aware that Wayne Smallwood had admitted to – or had told [the prosecutor] that sometime prior to the fire [Wayne] had taken down those smoke detectors?

| Agent Meuris: | A few months ago when we were prepping for trial, [the prosecutor] mentioned something that Wayne said, "One of [the smoke detectors] was just hanging. I just ripped it down," or something to that effect. |
|---|---|
| Defense Counsel: | So Wayne Smallwood said that he had taken down those smoke detectors at some point prior to this fire, correct? |
| Agent Meuris: | You know, it wasn't that specific. It was more sort of a vague – it was non-specific of time and date. And clearly by that smoke detector, it hadn't been ripped down. It had been disconnected. |
| . . . . | |
| Defense Counsel: | But non-specific or not, Wayne said he had removed or taken down the smoke detector before – at some point before the fire, true, sir? Hasn't [the prosecutor] told you that? |
| Agent Meuris: | That's what [the prosecutor] told me, yes. |

Trial Tr., DN 209, pp. 45:5-46:2. As this testimony from the trial shows, the Defendant was able to specifically question Agent Meuris about the statement Wayne made to prosecutors. Accordingly, any argument that the Court erred by prohibiting the Defendant from questioning Agent Meuris about Wayne's statement is unavailing and unsupported by the record.

Finally, the Court notes that Wayne Smallwood was present at the trial and available to testify but was not called by either party. The Defendant could have directly questioned Wayne about his statement to prosecutors but chose not to do so.

In all, Wayne's statement to prosecutors that he had removed the smoke detectors sometime prior to the fire was presented to the jury through the testimony of Agent Meuris. Therefore, it was not excluded from the trial, and there was no error of sufficient magnitude in the Court's rulings on this issue to warrant a new trial.

**7.**

Next, the Defendant argues that the Court erred by limiting the scope of questions she

could ask Dr. Eric Berg about the blunt force trauma and laceration injuries he discovered on the body of the Defendant's son.

Dr. Berg, the forensic pathologist who performed an autopsy of the son's body, concluded that the child's death was caused by thermal and smoke inhalation injuries suffered in the fire. Test. Eric Berg, DN 207, p. 128:1-3. While performing the autopsy Dr. Berg also discovered that the child had blunt force trauma to the head and a laceration on his chest. Although these injuries did not contribute to the cause of death, Dr. Berg could not determine whether they resulted from the fire or occurred beforehand.

The Defendant did not dispute that the fire caused the child's death. Trial Tr., DN 206, p. 263:16-19. That said, the defense sought to question Dr. Berg about the blunt force trauma and laceration injuries on the theory that they were caused by the Defendant's husband prior to the fire and that he was the actual perpetrator of the arson that killed the child. Def. Mot., DN 225, pp. 8-9.

In deciding whether to question Dr. Berg about these injuries, the Defendant was confronted with a choice. The Court had previously barred the Government from introducing photographs of the child's burned body because their probative value was substantially outweighed by their unfair prejudice to the Defendant. *Id.* at pp. 120:21-121:4. The Court cautioned the defense that they could ask questions about the blunt force trauma and laceration injuries, but if they did so, they would open the door for the Government to introduce photographs of the child's burns. *Id.* at pp. 123:8-11. The Court reasoned that any questions regarding the blunt force trauma and laceration injuries would unnecessarily confuse the jury regarding the cause of death. If the Defendant asked questions about the trauma and laceration injuries, the photographs of the child's burns would become much more probative because the

Government bore the burden of proving that the child died as a result of the fire and not other injuries. *Id.* at pp. 122:13-123:6. Left with this choice, the Defendant declined to question Dr. Berg about the blunt force trauma or laceration injuries.

During the course of the trial the Court reviewed photographs showing the child's burns and blunt force trauma and laceration injuries. The Court found that the "head wound is not – compared to the [thermal and smoke] injuries, it is not visually significant. And the same way with the chest wound." *Id.* at p. 122:9-12. Any questions about the trauma or laceration injuries would have confused the jury as to the cause of death, and it would have then been proper for the Government to introduce pictures showing the nature and extent of the child's burns. The Defendant was not prejudice by the choice offered by the Court, and there was no error of sufficient magnitude in the Court's ruling to warrant a new trial.

**8.**

Next, the Defendant seeks a new trial on the basis that the Court erred when it limited the cross-examination of Jack Randall, the Government's expert witness who testified regarding the accuracy and completeness of AT&T's call detail records. The Court addressed the substance of Randall's testimony at length when ruling upon the Defendant's motion for judgment of acquittal and will not reexamine the substance in the present motion. *See Smallwood*, 2012 WL 6026499, at *6-*9. Instead, the Court addresses the four errors the Defendant assigns to the Court's rulings during the cross-examination of Randall's opinions.

First, the Defendant claims that it was error to prohibit the defense from questioning Randall about a regulatory action brought against AT&T by the Tennessee Regulatory Authority. While cross-examining Randall, the Defendant sought to ask: "And I assume, then, you're aware that AT&T was forced to go in front of the Tennessee Regulatory Authority because of a

computer error that had to do with their records and billings?" Trial Tr., DN 206, p. 109:1-4.
The Court ruled that the Defendant could not ask this question for two reasons. First, the
question had no probative value and may have been irrelevant because the defense laid no
foundation for it. *Id.* at p. 109:16-21. Counsel for the defense could not tell the Court the year in
which the regulatory action occurred and could not provide any other specifics about that
proceeding. *Id.* Given the open-ended nature of this question, the Court did not err in excluding
it. Second, the regulatory action concerned AT&T's billing records, not the company's call
detail records. As pointed about by the Court, the evidence at issue was the accuracy and
completeness of AT&T's call detail records, not its billing records. *Id.* at p. 109:13-15. The
regulatory action on which the Defendant sought to question Randall about was an action
concerning discrepancies in customer's bills and not the company's call detail records.
Therefore, the question was irrelevant to the issue before the Court.

Second, the Defendant also claims the Court erred when it prohibited the Defendant from
asking Randall about lawsuits AT&T settled with customers who had been overbilled. *Id.* at pp.
110:22-111:2. Again, the Court excluded this question because the Defendant failed to provide
any particular information about or description of these lawsuits. *Id.* at p. 111:3-15. Counsel for
the Defendant feely admitted that they only had general information about those cases. *Id.* at p.
111:5-6. Therefore, the Court excluded the question because it had no probative value. *Id.* at pp.
111:14, 112:1-4.

Third, the Defendant assigns error to the Court's ruling that prohibited her from asking
Randall about an independent audit of AT&T's records. This audit allegedly found the
company's billing to be "inaccurate by 300 percent." *Id.* at p. 112:13-21. When the Court
pressed the Defendant for simple information about this audit, including the name of the agency

that performed it, the Defendant failed to provide any specifics. Again, the Defendant laid no foundation in the record for this question, and the Court did not err by excluding it.

Fourth, the Defendant argues that the Court erred when it prohibited the introduction of an affidavit Randall prepared regarding the phone records at issue. Although the Defendant assigns error to this action, she fails to explain why the exclusion was prejudicial. A review of the record shows that the affidavit was excluded because the Court found it would create confusion among the jurors if admitted. *Id.* at p. 115:6-25. Randall produced the affidavit in response to a motion to quash. The affidavit was used to prove that a letter from another AT&T employee, Karla Guillory, was a business record produced in the ordinary course of business. The underlying business record was admitted at trial, and the Court excluded the affidavit authenticating that record in order to avoid confusion of issues. The Court did not error in excluding the affidavit from evidence because it was wholly unnecessary after the document it authenticated was introduced.

In all, the Defendant's assertion that the Court erred by limiting the cross-examination of Jack Randall is without merit. The Court did not commit an error of sufficient magnitude to warrant new trial by excluding the four categories of testimony and evidence discussed above.

**9.**

Next, the Defendant argues that the Court erred by limiting the direct examination of Manfred Schenk, the defense's expert witness for phone system operations. The Government's phone expert, Jack Randall, testified that AT&T's call detail records were 99.99947 percent complete. *Id.* at p. 73:15. The Defendant sought to elicit rebuttal testimony from Schenk that would discredit Randall's testimony. *See* Test. Manfred Schenk, DN 209, pp. 138:24-139:3. The Government objected on the grounds that Schenk "was offered by the defense as an expert

who is going to testify that a direct phone call could have been placed to [the Defendant's] from the pole, junction box, equipment closet, or some other nearby intercept point that bypassed the central office. That's it." *Id.* at p. 139:7-12. According to the Government, Schenk was never disclosed as an expert who would rebut the Government's assertion that the records collected by AT&T's phone switching system were 99.99947 percent complete. *Id.* at p. 139:6-22.

On direct examination the Defendant sought to ask Schenk, "In your experience, is any software program 99.99 percent accurate?" *Id.* at p. 140:8-9. That question clearly called for Schenk to give an expert opinion. *Id.* at p. 140:10. As pointed out by the Court, the Defendant did not disclose the basis for Schenk's opinion that AT&T's phone switching system was less than 99 percent reliable. *Id.* at p. 140:19-23. Accordingly, the Court excluded Schenk's opinion about the accuracy of AT&T's phone records because "[the defense] didn't provide any [notice that Schenk was] going to give this opinion. You didn't provide a basis for the opinion. You didn't provide what data he relied upon. You didn't provide that to the prosecution. Furthermore, you haven't even shown it through this witness that he's qualified to give that kind of information[.]" *Id.* at p. 169:10-16.

At the Government's request, a defendant must identify any expert witnesses he or she intends to call and must provide the Government with a summary "describing the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). Schenk was not timely disclosed as an expert who would rebut the accuracy of AT&T's phone records. A summary of his opinion on this issue was never provided to the Government or to the Court, and it was never shown that he was qualified to offer this opinion. Accordingly, his opinions were properly excluded from trial because they were untimely. The Court's exclusion of Schenk's opinion on this issue was not an error of sufficient

magnitude to warrant a new trial.

**10.**

Next, the Defendant claims that the Court erred when it excluded photographs of the Defendant with her children and prohibited testimony about her religious nature. According to the Defendant, this evidence was an integral part of her character evidence and she was prejudiced by its exclusion.

Regarding the photographs of the Defendant's children, the Court ruled that any probative value created by the pictures was substantially outweighed by the unfair prejudice that would have resulted from their introduction. Trial Tr., DN 209, p. 21:20-22. Evidence may properly be excluded when its probative value is substantially outweighed by the unfair prejudice it creates. *See* Fed. R. Evid. 403. As used in Rule 403, the term "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee notes. After reviewing the pictures of the Defendant and her children, the Court determined that the pictures should be excluded because they had little, if any, probative value and would have suggested that the jury render a decision on emotional sympathies rather than the evidence before it. A number of character witnesses testified that the Defendant loved her children, dutifully cared for them, and put their needs before her own. *See* Test. Buffy Duval, Test. Stephanie Hamblin, Test. Rebecca Rotz, Test. Christina Torres, DN 209, pp. 84-127. Given the extent of this testimony, the Court did not err by excluding the photographs of the Defendant and her children.

Additionally, the Court did not err when it excluded testimony about the Defendant's religious propensity. The Defendant attempted to introduce this evidence during the testimony of her character witnesses. *See, e.g.*, Test. Buffy Duvall, DN 209, p. 87:10-14. The Government

promptly objected and requested a bench conference. *Id*. at p. 87:15-16. In sustaining the objection, the Court clearly stated, "[W]hether you're religious or not, a case shouldn't be decided on that." *Id*. at p. 88:11-12. There was no error in this ruling that would warrant a new trial. Evidence of the Defendant's religious nature had little, if any, relevance in this case. And even if mildly relevant, the probative value of such evidence was substantially outweighed by the potential that the jury would render a decision based on the Defendant's religious beliefs and not on the evidence before it. Accordingly, it was properly excluded.

In all, exclusion of the photographs of the Defendant with her children and of testimony regarding the Defendant's religious propensity was not an error of sufficient magnitude to warrant new trial.

## 11.

Next, the Defendant assigns error to the Court's exclusion of certain opinions she sought to elicit from Dr. Jeffrey Guy, the physician who treated her burns at Vanderbilt University Medical Center. The Court excluded these opinions in a pretrial ruling. *See* Mem. Op. & Order of June 8, 2012, DN 173, pp. 2-3.

The Defendant sought to elicit two opinions from Dr. Guy. First, he was of the opinion that the Defendant "was burned by the energy source coming toward her." Def.'s Mot., DN 163-1. Second, he offered to describe the mechanics of her burn patterns: "When running you are moving away from the energy source by lifting your legs running, you are protecting the back of your legs." *Id.*

The Court excluded Dr. Guy's opinions because they "lack[ed] the necessary foundation that would assure their reliability[.]" Mem. Op. & Order of June 8, 2012, DN 173, p. 3. Although Dr. Guy was qualified to offer medical opinions as to the nature and treatment of the

Defendant's burns, the Court found that his other opinions were "not based on his medical expertise with burns but instead on some vague notion of the mechanics of running." *Id.* The Court also noted that Dr. Guy's newly offered opinions were untimely. *Id.* at 3.

The Court will not revisit its previous ruling excluding Dr. Guy's opinions. In her motion for new trial the Defendant argues that it was error for the Court to exclude these opinions but offers no reasoning to support her argument. There was no error of sufficient magnitude in the Court's previous ruling to warrant a new trial.

**12.**

Finally, the Defendant argues that a new trial must be granted because the jury may have been influenced by an allegedly prejudicial article published in print and on the Internet by the *Courier-Journal* newspaper prior the conclusion of the trial. Despite raising this allegation, the Defendant has not supported her argument with any evidence indicating that jurors were actually influenced by this article or were even aware it existed.

The Court repeatedly and forcefully instructed jurors to avoid reading, listening to, or watching anything relating to the trial. At the close of *voir dire*, after the jury had been empaneled, the Court instructed the jury to "avoid reading anything in the paper about [the case]." *Voir Dire* Tr., DN 212, p. 93:15. The Court also instructed the jury "not to get on a computer and do anything about this case." *Id.* at p. 93:23-24. At the close of the first day of trial the Court reiterated its previous instructions to the jury: "Remember the things I told you before. Don't read anything in the paper. Don't watch anything on television. Don't communicate with each other by e-mail. Don't get on a computer, research, Facebook, e-mail, do anything concerned with this case[.]" Trial Tr., DN 203, p. 139:7-11. The Court gave the jury similar instructions each day the trial adjourned. *See* Trial Tr., DN 204, p. 156:12-20; Trial

Tr. DN 205, p. 197:7-13; Trial Tr., DN 206, p. 256:16-21; Trial Tr., DN 207, p. 130:10-19; Trial Tr., DN 208, p. 260:4-8; Trial Tr., DN 209, p. 173:9-15; Trial Tr., DN 210, p. 75:10-18.

"[W]here a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." *United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir. 1985). It is an "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Francis v. Franklin*, 471 U.S. 307, 325, n.9 (1985)).

The Defendant has presented no evidence showing that any member of the jury actually read the allegedly prejudicial article or even knew of its existence. The Defendant's lack of evidence on this point is confirmed by her argument that "members of the jury panel *may* have been influenced by reading this prejudicial article." Def. Mot., DN 225, p. 12 (emphasis added). Mere speculation that the members of the jury read and were influenced by the *Courier-Journal* article is not enough to overcome the presumption that the jury followed the Court's instructions not to participate in such activities. Accordingly, no error of sufficient magnitude warranting a new trail resulted from the allegedly prejudicial newspaper article.

## CONCLUSION

Defendant Billi Jo Smallwood moves for a new trial on twelve separate grounds. Having considered each ground asserted by the Defendant and for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the Defendant's motion for new made pursuant to Federal Rule of Criminal Procedure 33 is **DENIED**.